1  **HOWARD LAW, PC**
   VINCENT D. HOWARD, State Bar No. 232478
2  vhoward@howardlawpc.com
   GREGORY H. D. ALUMIT, State Bar No. 257124
3  galumit@howardlawpc.com
   675 Anton Boulevard, First Floor
4  Costa Mesa, CA 92626
   (800) 872-5925 Telephone
5  (888) 533-7310 Facsimile
   www.HOWARDLAWPC.com
6
   **ARBOGAST LAW**
7  **A Professional Corporation**
   DAVID M. ARBOGAST, State Bar No. 167571
8  david@arbogastlawpc.com
   11400 W. Olympic Blvd., 2nd Floor
9  Los Angeles, CA 90064
   (310) 477-7200 Telephone
10 (310) 943-2309 Facsimile

11 Attorneys for Plaintiffs and the proposed Class
12
13              **UNITED STATES DISTRICT COURT**
14              **CENTRAL DISTRICT OF CALIFORNIA**

15  GREGORY P. STOKES and MARIAN N.  ) CASE NO.: CV14-0278 MRP-SHx
16  STOKES, on behalf of themselves and all )
17  others similarly situated,              ) **CLASS ACTION COMPLAINT FOR:**
                                            )
18            Plaintiffs,                   ) 1. **VIOLATIONS OF THE**
                                            )    **CALIFORNIA HOMEOWNER**
19                                          )    **BILL OF RIGHTS; and**
        v.                                  )
20                                          ) 2. **VIOLATIONS OF THE**
                                            )    **CALIFORNIA UNFAIR**
21  CITIMORTGAGE, INC.; and DOES 1-         )    **COMPETITION ACT**
22  10, inclusive                           )
                                            ) <u>**JURY TRIAL DEMANDED**</u>
23            Defendants.                   )
24                                          )
25                                          )
                                            )
26  _____)
27
28

CLASS ACTION COMPLAINT
- 1 -

Plaintiffs GREGORY P. STOKES and MARIAN N. STOKES ("Plaintiffs"), individually, and on behalf of all others similarly situated, allege as follows:

## I. INTRODUCTION

1. This is an action pursuant to California's Homeowner Bill Of Rights, California's Unfair Competition Law, and other California statutory and common laws. Plaintiffs, individually, and on behalf of all others similarly situated, bring this action against CITIMORTGAGE, INC.; and DOES 1-10 (collectively referred to herein as "Defendants") based upon Defendants' routine business practices of illegally processing both foreclosures and loan modifications at the same time (also known as "dual-tracking") and of illegally charging late fees when a homeowner's loan modification application is pending.

2. By engaging in the above-described business practices, Defendants have uniformly violated the Homeowner Bill Of Rights and have committed one or more acts of unfair competition within the meaning of California *Business & Professions Code* §§ 17200, *et seq.*

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 *U.S.C.* § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Members of the Class are citizens of a state different from Defendants.

4. This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the State of California or otherwise conduct business in the State of California.

5. Venue is proper in this Court pursuant to 28 *U.S.C.* § 1391(b) in as much as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, and one of the named Plaintiffs resides in this District.

///

## III. PARTIES

### A. The Plaintiffs

6. Plaintiffs GREGORY P. STOKES and MARIAN N. STOKES ("Plaintiffs") are citizens and residents of Orange County, California and, at all times relevant, residing at 17342 Brooklyn Avenue in Yorba Linda, California 92886 (the "Subject Property"). The Subject Property was Plaintiffs' principal residence and was owner-occupied. On or about April 17, 2003, Plaintiffs obtained a home mortgage on the Subject Property that is serviced by Defendants.

### B. The Defendants

7. Defendant CITIMORTGAGE, INC., (hereafter "CITIMORTGAGE") is, and at all times mentioned in this Class Action Complaint was, a corporation, registered in New York, United States, headquartered in O'Fallon, Missouri. CITIMORTGAGE became the successor by merger to ABN AMRO MORTGAGE GROUP, INC. effective September 1, 2007. (See Certificate of Merger of ABN AMRO Mortgage Group, Inc. into CITIMORTGAGE, INC. under Section 904 of the Business Corporation Law (hereinafter "Certificate of Merger") filed on August 31, 2007, as document number 070831000219 with the Secretary of State of New York. At all times mentioned herein, CITIMORTGAGE acquired and serviced some or all of the mortgage loans that are the subject of this Complaint and include subprime and nonperforming residential mortgage loans. CITIMORTGAGE is licensed to do business in California and transacts business throughout California.

8. The true names and capacities, whether individual, corporate, associate or otherwise, of Doe Defendants 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Doe Defendants by such fictitious names. On information and belief, each Doe Defendant is responsible for the actions herein alleged. Plaintiffs will amend this Class Action Complaint when the names of said Doe Defendants have been ascertained (hereinafter "Defendants" refers to both named and Doe Defendants unless

otherwise specified by name).

9. Plaintiffs are informed, believe, and thereon allege that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

10. Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

11. At all times herein mentioned, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

12. Plaintiffs are informed, believe, and thereon allege, that Defendants, and each of them, and at all material times relevant to this Complaint, performed the acts alleged herein and/or otherwise conducted business in California. Defendants, and each of them, are corporations or other business entities, form unknown, have, and are doing business in this judicial district.

13. Plaintiffs are informed, believe, and thereon allege, that at all times relevant during the liability period, that Defendants, and each of them, including without limitation those Defendants herein sued as Does, were acting in concert or

participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

## IV.  FACTS COMMON TO ALL CAUSES OF ACTION

### A.  Mortgage Servicing

14. A mortgage servicer stands in for the beneficial owner of a mortgage loan in virtually all dealings with homeowners. It is the servicer to whom the homeowners mail their monthly payments, the servicer who provides billing and tax statements for homeowners, and the servicer to whom a homeowner in distress must address a petition for a loan modification and/or postponement of a foreclosure sale. There are servicers called "special servicers" or "default servicers" who specialize in servicing mortgages on which the borrowers have missed payments, so called nonperforming residential mortgage loans.

15. Servicers' main source of income is the monthly servicing fee based on a percentage of the outstanding principal balance of a loan. The higher a servicer can keep the principal balance – whether by capitalizing arrears and unpaid fees to a delinquent loan, holding a borrower's regular or trial plan payments in a suspense account instead of applying them to the principal balance, and/or refusing to initiate or postponing a foreclosure – the larger the monthly servicing fee will be.

16. Servicers also make money from foreclosures, and can often make more money foreclosing on a home than from modifying a loan. The potential losses of income from the monthly servicing fee are often dwarfed by the fees generated for the servicer by the foreclosure process. Servicers retain fees charged to delinquent homeowners, including late fees and fees for "default management" such as property inspections. The profitability of these fees can be significant, and late fees alone constitute a significant fraction of many subprime servicers' total

income and profit. Servicers collect these fees from the proceeds of the foreclosure before the owners of the mortgage loan receive any recovery. This guaranteed recovery of fees provides a strong incentive for servicers to foreclose on properties.

17. Many servicers also in-source activities like force-placed insurance, property inspections, appraisals, title searches, and legal services to affiliated entities. In-sourcing allows servicers' affiliates to charge inflated fees that get passed along to the homeowners and can come at the expense of owners of the defaulted loans if a foreclosure does not produce sufficient income to repay all the foreclosure fees. The profit potential of retained fee income gives servicers a financial incentive to overreach in imposing ancillary fees and to load up accounts with such fees. This practice lowers the ultimate return to owners of the defaulted loans by driving some borrowers into foreclosure in the first place or by reducing the share of foreclosure recoveries available because of the senior priority of servicers' fees.

18. Financially distressed homeowners are also unlikely to notice these late fees or inflated foreclosure fees. Even if they do, they lack the fiscal and emotional wherewithal to fight them and get little benefit from avoiding them. Avoiding an illegal servicer fee will not cure a mortgage default, much less make the mortgage affordable going forward. Unless the homeowner has equity in the property, once that homeowner is losing the property, there is little point in haggling over another $15 or even $1,000, especially as deficiency judgments are often not permitted and even when permitted, are frequently not pursued. Even small illegal fees, which are less likely to draw attention, can be quite profitable for servicers. Just one improper late fee of $15 on each loan in a fairly typically sized loan pool of 7,000 loans would generate an additional $105,000 in income for the servicer. Whereas illegal fees on performing mortgages might engender complaints and pushback from the mortgagors, a defaulted homeowner is unlikely to have the presence of mind to notice an illegal fee, much less the financial means to fight it.

Thus, there is relatively low risk from imposing illegal fees upon defaulted accounts, and a significant upside. If challenged about an illegal fee, a servicer can easily refund the fee, apologize, and claim that it was a one-off mistake. The homeowner is unlikely to pursue legal action or to know if illegal fees are a systemic practice.

19. In a self-perpetuating cycle, the imposition of fees makes a foreclosure more likely by pricing a modification out of a homeowners' reach: the assessed fees can eat up all of the homeowners' savings if they are imposed as a lump sum, or make monthly payments unaffordable if the fees are capitalized to the loan.

20. Servicers have a strong incentive to manipulate market perceptions of the quality of the pool. If a servicer's pool of loans appears high quality, the valuation of the servicer's largest assets, its mortgage servicing rights, will also appear higher, and the servicer's book value, stock price, and credit rating are all likely to be elevated. Thus, managing market perception of the quality of the loan pool is therefore of the utmost importance for servicers. One way servicers have camouflaged weaknesses in the pool has been by "re-aging" delinquent mortgages. Servicers accomplish re-aging by entering into short-term workout agreements with homeowners. Short-term workout agreements allow servicers to skirt the accounting rules that require modified loans to be reported as delinquent for a period after modification and can expedite the recovery of servicing fees and advances.

21. Servicers have expenses when a loan is in default: advances of principal and interest to the owners of the loans, advances of property taxes and home insurance, and advance payments to third parties for default services such as property inspections, title searches, attorney fees, property maintenance fees, and foreclosure fees. The financing cost of advances on delinquent loans is the largest expense of many servicers. Reducing the cost of this expense is a key component of making servicing profitable. Once a foreclosure is complete, the requirement to

continue making advances stops and servicers are entitled to receive their advances back. Servicers' advances are taken off the top, in full, at the post-foreclosure sale, before the owner of the loan receives anything. The availability of third-party fees also rewards servicers for initiating foreclosure, proceeding with a foreclosure, and, in the case of post-foreclosure sale fees, concluding a foreclosure. Such third party fees can price a modification out of reach of a homeowner, if the fees are added to the principal balance or the homeowner is asked to pay the accumulated fees before entering into the modification. Additionally, a short-term repayment plan is a more attractive option to servicers. Such a plan requires little or no underwriting, does not require the servicer to recognize any long-term loss and, because it is quick, it addresses servicers' largest expense: the black hole of financing principal and interest advances to the owners of the loans and the advance payments for default services.

**B.    Dual Tracking**

22.    Dual tracking occurs when servicers process both foreclosures and loan modifications at the same time. The incentives discussed above encourage servicers to proceed along a dual track. But the lack of communication between a servicer's loan modification and the foreclosure departments, the piling on of foreclosure fees, and the longer time to process a loan modification than a foreclosure, all mean that needless foreclosures are commonplace.

23.    Subprime servicers, in particular, are expected to show strict adherence to explicit timelines, offer and accept workouts from only a predefined and standardized set of options, and not delay foreclosure while loss mitigation is underway. The speed at which loans are moved from default through foreclosure is a key driver in the servicer rating process, encouraging servicers to compete for the fastest time to foreclosure.

24.    Servicers process foreclosures and loan modifications through different departments. Communication between the two departments is imperfect.

Homeowners who are assured that they will be receiving a loan modification by one department may nonetheless find themselves facing a foreclosure. In part because loan modifications often require more deviations from the norm, they often take more time to work out than foreclosures do. Servicers rely heavily on the mechanized production of form documents in processing both foreclosures and loan modifications. Any variation from the cookie-cutter norm imposed by the form documents causes delay. But the dual-track system pushes the foreclosure forward regardless of any delay in the modification process, with the result that foreclosures frequently occur while homeowners are negotiating a loan modification, sometimes even after they have been approved for a loan modification.

25.  Even if a foreclosure never happens, the cost of the modification increases as the servicer imposes various foreclosure-related and often improper fees on the homeowner, and the homeowner suffers the financial, credit, and emotional toll of defending a foreclosure. These fees are lucrative to the servicer but can price a modification out of a homeowner's reach. Moreover, where there is little or no equity left in the home, reimbursement for these fees will come out of the owner of the loan's pockets at any foreclosure sale.

26.  The dual-track system has allowed servicers to continue to skim costs from the foreclosure process. Worse, because the dual-track system does not ensure that homeowners are evaluated for appropriate loan modifications before foreclosure, it has resulted in many unnecessary and expensive foreclosures.

**C.  California's Home Owner Bill Of Rights Outlaws Dual Tracking And Provides Other Protections For Distressed Homeowners**

27.  The California Homeowner Bill Of Rights ("HBOR") became law on January 1, 2013. The HBOR marked the third step in California Attorney General Kamala Harris' response to the state's foreclosure and mortgage crisis. The first step was to create the Mortgage Fraud Strike Force, which has been investigating

and prosecuting misconduct at all stages of the mortgage process. The second step was to extract a commitment from the nation's five largest banks of an estimated $18 billion for California borrowers under the National Mortgage Settlement. This joint federal-state settlement contained thoughtful foreclosure and mortgage servicing reforms. However, these reforms are only applicable for three years, and only to loans serviced by the five settling banks: Ally/GMAC, Bank of America, Citi, JPMorgan Chase and Wells Fargo. Thus, the California Legislature intended the HBOR to extend the reforms addressed in the national mortgage settlement to almost all mortgage lenders and servicers and to bring fairness, accountability, and transparency to the state's mortgage and foreclosure process.

28. According to California's Department of Justice and the Office of the Attorney General, the purpose of the HBOR is to ensure that as part of California's nonjudicial foreclosure process, borrowers are considered for, and have a meaningful opportunity to obtain available loss mitigation options, if any, offered by or through the borrowers' mortgage servicer, such as loan modifications or other alternatives to foreclosure.

29. One of the most important aspects of the HBOR is that it outlaws dual-tracking. Specifically, *California Civil Code* §§ 2923.6, 2923.11, and 2924.18 prohibit initiating or continuing the foreclosure process when a borrower's request for loss mitigation is under consideration, or a foreclosure prevention is approved in writing.

30. Another important provision of the HBOR prohibits the collection of any late fees when a loan modification application is pending or while the borrower is making timely modification payments. *California Civil Code* § 2924.11(f).

**D. Defendants' Business Practices**

31. CITIMORTGAGE specializes in the servicing of subprime and seriously delinquent loans and serviced some or all of the subject home mortgage loans at issue.

32. CITIMORTGAGE has two separate departments that handle Loss Mitigations and Foreclosures. The Loss Mitigation department is supposed to provide loan resolution and workout strategy for non-performing loans. The Foreclosure department is supposed to facilitate completion of the foreclosure process, ensure timeline adherence, eliminate redundancies, and minimize losses during the foreclosure process. These departments rarely communicate effectively, if at all, with each other.

33. As a consequence of Defendants' business practice, Defendants have routinely failed to comply with the HBOR's dual-tracking ban because Defendants continue to process loss mitigation options for homeowners and foreclosure sales for these same homeowners at the same time.

34. CITIMORTGAGE maintains a business practice to charge delinquent loans late fees. Even if a defaulted or delinquent loan is being considered for a resolution or the loan already has an active loss mitigation resolution pending, CITIMORTGAGE has a policy to continue charging these homeowners late fees. This is a win-win practice for CITIMORTGAGE because these late fees can be capitalized to the loan adding to the unpaid principal balance thus increasing CITIMORTGAGE's monthly servicing fee or CITIMORTGAGE can recoup these late fees after a foreclosure sale. However, this regular practice at CITIMORTGAGE violates the HBOR's ban on collecting late fees when a loan modification is pending.

35. CITIMORTGAGE regularly makes acquisitions to increase its mortgage servicing portfolio and sells a substantial portion of its mortgage servicing rights to other companies. Thus, it is the utmost importance to CITIMORTGAGE for its loans to appear high quality so the valuation of its mortgage servicing rights increase. CITIMORTGAGE, in order to camouflage weaknesses in its pool of loans, regularly offers delinquent homeowners short-term trial plan workout agreements, which allows CITIMORTGAGE to skirt the

accounting rules requiring modified loans to be reported as delinquent for a period after modification by re-aging the loan and expedites the recovery of servicing fees and advances. Furthermore, CITIMORTGAGE's business practice to regularly offer delinquent homeowners short-term trial plan workout agreements addresses and minimizes CITIMORTGAGE's largest expense: the black hole of financing principal and interest advances to the owners of the defaulted loans and other advance payments for default services such as property inspections, title searches, attorney fees, property maintenance fees, and foreclosure fees.

36. CITIMORTGAGE's routine business practice to place delinquent homeowners in short-term trial plan workout agreements allows Defendants to put the receipt of a homeowner's trial plan payments in a suspense account without applying the payments to the homeowner's principal balance so Defendants' can consider these homeowners to be delinquent and continue to charge them late fees. This is a win-win practice for CITIMORTGAGE because these late fees can be capitalized to the loan, adding to the unpaid principal balance thus increasing CITIMORTGAGE's monthly servicing fee or permitting CITIMORTGAGE to recoup these late fees after a foreclosure sale. However, this regular practice violates the HBOR's ban on collecting late fees when a loan modification is pending or while a homeowner is making timely modification payments like trial plan payments.

37. CITIMORTGAGE maintains a business practice with its affiliates to in-source default management activities like force-placed insurance, appraisals, title searches, property maintenance fees, and legal services. Insourcing allows CITIMORTGAGE's affiliates to charge inflated fees that are passed along to the homeowners and can come at the expense of owners of the defaulted loans if a foreclosure does not produce sufficient income to repay all the foreclosure fees. This profit potential of retained fee income gives Defendants a financial incentive to overreach in imposing ancillary default fees and to load up accounts with such

fees.

38. At all times relevant, CITIMORTGAGE maintains an illegal automated dual-track system where its Loss Mitigation Department processes loan modification applications while at the same time its Default Servicing Unit continues to follow the path of least resistance and surest returns for Defendants – foreclosures. And throughout this illegal dual-track business practice, Defendants, and each of them, maintain a practice to continue to charge homeowners illegal late fees.

39. At all times relevant, Defendants, and each of them, have received payments, including, but not limited to, illegal late fees from Plaintiffs and the Class and have therefore been unjustly enriched at the expense of Plaintiffs and the Class.

## V. PLAINTIFFS' EXPERIENCE WITH DEFENDANTS

40. On or about July 10, 2013, Plaintiffs Gregory and Marian Stokes (hereinafter the "Stokes") submitted a loan modification application to CITIMORTGAGE.

41. On or about July 18, 2013, a Notice of Default was filed on behalf of CITIMORTGAGE as Title Order No. 730-1302064-70.

42. On or about July 31, 2013, CITIMORTGAGE informed the Stokes that the Homeowner Support Specialist assigned to the file was Michael Herman and that further hardship documentation was needed to complete the review. The Stokes furnished all of CITIMORTGAGE's requested documents, except for the tax returns which had not yet been filed. The Stokes advised CITIMORTGAGE that they were unable to provide such documentation. On or about October 10, 2013 the Stokes received a letter from CITIMORTGAGE stating that the request for mortgage assistance through the Home Affordable Modification Program ("HAMP") had been denied due to the homeowners' inability to provide all requested documentation.

43. On or about October 24, 2013, Defendant caused to be recorded and caused to be filed the Notice of Trustee Sale of Plaintiff's Stokes, home. The Trustee's Sale was scheduled to take place on November 18, 2013.

44. On or about October 31, 2013, the Stokes re-submitted a loan modification application to CITIMORTGAGE. Thereafter, on or about November 4, 2013, CITIMORTGAGE requested that the Stokes provide them with additional hardship documents. The Stokes responded by submitting all requested documentation.

45. On or about November 12, 2013, CITIMORTGAGE informed the Stokes that their loan modification application was still pending and in active review. Thereafter, on or about November 13, 2013; November 14, 2013; and November 15, 2013; and November 18, 2013, CITIMORTGAGE sent identical letters to the Stokes advising that their loan modification application was still pending and in active review.

46. On or about November 18, 2013, CITIMORTGAGE caused the Trustee's Sale to be rescheduled from November 18 to December 16, 2013.

47. On or about November 22, 2013, the Stokes, with the assistance of Sylvia Carlson, a loan modification specialist, submitted to CITIMORTGAGE requested hardship documentation. On or about November 27, 2013, CITIMORTGAGE verbally informed Ms. Carlson that a complete package was in review and that no further documentation was required.

48. On or about December 5, 2013, Ms. Carlson received a call from CITIMORTGAGE stating that additional documentation was needed for the loan modification application. On or about December 9, 2013, the requested documentation was submitted to CITIMORTGAGE.

49. On or about December 11, 2013, Homeowner Support Specialist, Mike Harman, informed loan modification specialist, Ms. Carlson that CITIMORTGAGE was missing the borrower's tax return transcripts. Ms. Carlson informed Mr.

1 Harman that these documents had been ordered.

50. On or about December 13, 2013, CITIMORTGAGE called Ms. Carlson and verbally informed her that the underwriter had declined the loan modification application and suggested that the borrowers pursue a short sale. After discussing with the Stokes, Ms. Carlson informed CITIMORTGAGE that the borrowers would like to be considered for a short sale since that was the only alternative offered by CITIMORTGAGE.

51. On or about December 16, 2013, the Stokes were informed that the Subject Property had been sold at a Trustee's Sale; notwithstanding they had an active loan modification package pending where there was not detailed denial or acceptance ever sent to the Stokes and notwithstanding Defendants suggested the Stokes explore options to short-sale the Subject Property.

52. On or about December 18, 2013, CITIMORTGAGE sent a text message to the Stokes advising that their request for a modification was in review. Thereafter, the Stokes received correspondence from CITIMORTGAGE dated December 17, 2013 stating that their file was in review. The Stokes received the aforementioned communications _after_ their home was sold.

53. On or about December 20, 2013, the Stokes received a written notice from CITIMORTGAGE stating that their request for mortgage assistance was denied because their request was received after the program deadline.

## VI. CLASS ACTION ALLEGATIONS

54. Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to *Federal Rule of Civil Procedure* 23(a) and (b)(1), (b)(2), and/or (b)(3). The Class which Plaintiffs seek to represent is composed of and defined as follows:

> All California homeowners who applied for a loan modification with CITIMORTGAGE LOAN SERVICING, LLC who, at any time on or after January 1,

2013, received a Notice of Default, Notice of Trustee Sale, Trustee's Deed Upon Sale, and/or had any late fees charged to their accounts while their loan modification application was still pending.

55. Plaintiffs reserve the right to amend or modify the Class description with greater specificity or further division into subclasses or limitation to particular issues.

56. <u>Numerosity</u>: The Members of the class are so numerous that joinder of all Members would be unfeasible and not practicable. The membership of the entire class is unknown to Plaintiffs at this time; however, the Class is estimated to be in excess of a thousand individuals residing in California, and the identity of such membership is readily ascertainable via inspection of CITIMORTGAGE's business and loan servicing records. Class Members may be notified of the pendency of this action by electronic mail, the Internet, other mail, or published notice.

57. <u>Commonality</u>: There are common questions of law and fact as to the Class which predominate over questions affecting only individual Members, including, without limitation to:

    a. Whether Defendants violated California's Homeowner Bill Of Rights;

    b. Whether Defendants improperly recorded and/or caused to be recorded Notices of Default, Notices of Trustee Sale, and/or Trustee's Deed Upon Sale;

    c. Whether Defendants illegally charged homeowners late fees;

    d. Whether Defendants breached their trial plan agreements with homeowners;

    e. Whether Defendants' conduct was willful or reckless;

    f. Whether Defendants were unjustly enriched by their improper

     course of dealings with homeowners who submitted loan modification applications;

  g. Whether Defendants violated California's Unfair Competition Law;

  h. The amount of additional revenues and profits obtained by Defendants attributable to their violations of California's Unfair Competition Law;

  i. Whether Defendants engaged in practices that warrant equitable, injunctive, and monetary relief; and

  j. The effect upon and the extent of injuries suffered by Plaintiffs and other Class Members and the appropriate amount of reimbursement, restitution, damages, or other compensation.

58. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Members of the Class. Plaintiffs and all Members of the Plaintiff Class sustained injuries and damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each Member of the Plaintiff Class were caused directly by Defendants' wrongful conduct in violation of law as alleged herein.

59. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately protect the interests of the Members of the Class. Plaintiffs reside in California, Defendants serviced Plaintiffs' mortgage loans, and Plaintiffs are adequate representatives of the Plaintiff Class as they have no interests which are adverse to the interests of the absent Class Members. Plaintiffs have retained counsel who have substantial experience and success in the prosecution of complex class action and consumer protection litigation. The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

60. A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all Members of the Class is impracticable. Class action treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual Member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual Members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. The cost of the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

61. In the alternative, the Class should be certified because:

    a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members which would establish incompatible standards of conduct for Defendants;

    b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them, which would, as a practical matter, be dispositive of the interests of the other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

    c. Defendants have acted or refused to act on grounds generally applicable to the Class, and/or the General Public, thereby making final injunctive relief and/or declaratory relief with respect to the Class as a whole appropriate.

62. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.