**HOWARD LAW, PC**
VINCENT D. HOWARD (SBN 232478)
vhoward@howardlawpc.com
GREGORY H. D. ALUMIT (SBN 257124)
galumit@howardlawpc.com
675 Anton Boulevard, First Floor
Costa Mesa, CA 92626
Tel.: (800) 872-5925
Fax: (888) 533-7310

**ARBOGAST LAW**
A Professional Corporation
DAVID M. ARBOGAST (SBN 167571)
david@arbogastlawpc.com
11400 W. Olympic Blvd., 2nd Floor
Los Angeles, CA 90064
Tel.: (310) 477-7200
Fax: (310) 943-0416

Attorneys for Plaintiffs and the putative Class.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY P. STOKES, MARIAN N. STOKES, and AMELIA J. BRUMMEL, on behalf of themselves and all others similarly situated, | **CASE NO.** 2:14-cv-00278-DDP (SHx) |
| | [*Assigned to the Hon. Dean D. Pregerson*] |
| Plaintiffs, | |
| v. | <u>CLASS ACTION</u> |
| | **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** |
| CITIMORTGAGE, INC. and DOES 1-10, inclusive, | 1) **VIOLATION OF CALIFORNIA'S HBOR – BAN ON DUAL TRACKING;** |
| Defendants. | 2) **VIOLATION OF CALIFORNIA'S HBOR – ILLEGAL COLLECTION OF LATE FEES; and** |
| | 3) **VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ACT** |
| | **JURY TRIAL DEMANDED** |

1  Plaintiffs GREGORY P. STOKES, MARIAN N. STOKES, and AMELIA J.
2  BRUMMEL, individually, and on behalf of all others similarly situated, allege as
3  follows:

## I.  INTRODUCTION

1.  This is an action for violations of California's Homeowner Bill of Rights (the "HBOR") and California's Unfair Competition Law, Business & Professions Code §§ 17200, et seq. (the "UCL").  Plaintiffs, individually, and on behalf of all others similarly situated, bring this action against CITIMORTGAGE, INC. and DOES 1-10 based upon Defendants' routine business practices of 1) illegally pursuing foreclosures while homeowners' completed loan modification applications are pending (also known as "dual-tracking") and 2) illegally collecting late fees when homeowners' completed loan modifications application are pending.

2.  By engaging in the above-described business practices, Defendants have uniformly violated the HBOR and have committed one or more acts of unfair competition under the UCL.

## II.  JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a state different from Defendant.

4.  This Court has personal jurisdiction over the parties in this action because Defendant is licensed to do business in the State of California or otherwise conducts business in the State of California.

5.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in as much as the unlawful practices discussed herein are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the Plaintiffs reside in this District.

///

FIRST AMENDED CLASS ACTION COMPLAINT
2:14-cv-00278-DDP (SHx)

### III. PARTIES

#### A. The Plaintiffs

6.     Plaintiffs GREGORY P. STOKES and MARIAN N. STOKES (the "Stokes") are California citizens who reside, and at all times relevant have resided, at 17342 Brooklyn Avenue, Yorba Linda, California 92886, which is their principal residence.  On April 17, 2003, the Stokes obtained a mortgage on their home, which was, at all times relevant, serviced by Defendant.

7.     Plaintiff AMELIA J. BRUMMEL ("Ms. Brummel") is a California citizen who resides, and at all times relevant has resided, at 8714 Springside Court, Rancho Cucamonga, California 91730, which is her principal residence.  On May 7, 2009, Ms. Brummel obtained a mortgage on her home, which was, at all times relevant, serviced by Defendant.

8.     The Stokes and Ms. Brummel are sometimes collectively referred to herein as "Plaintiffs."

#### B. The Defendants

9.     Defendant CITIMORTGAGE, INC. ("Defendant") is, and at all times mentioned in this Class Action Complaint was, a corporation registered in New York and headquartered in O'Fallon, Missouri.  Defendant acquires and services some or all of the mortgage loans that are the subject of this Class Action Complaint. Defendant is licensed to do business in California and transacts business throughout California.

10.     The true names and capacities, whether individual, corporate, associates or otherwise, of Doe Defendants 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Doe Defendants by such fictitious names.  On information and belief, each Doe Defendant is responsible for the actions herein alleged.  Plaintiffs will amend this Class Action Complaint when the names of said Doe Defendants have been ascertained (hereinafter "Defendants" refers to both named and Doe Defendants unless otherwise specified by

name).

11.     Plaintiffs are informed, believe, and thereon allege that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

12.     Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

13.     At all times herein mentioned, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

14.     Plaintiffs are informed, believe, and thereon allege, that Defendants, and each of them, at all material times relevant to this Complaint, performed the acts alleged herein and/or otherwise conducted business in California.  Defendants, and each of them, are corporations or other business entities, form unknown, have and are doing business in this judicial district.

15.     Plaintiffs are informed, believe, and thereon allege, that at all times relevant during the liability period, that Defendants, and each of them, including without limitation those Defendants herein sued as Does, were acting in concert or participation with each other, or were joint participants and collaborators in the acts

complained of, and were the agents or employees of the others in doing the acts

complained of herein, each and all of them acting within the course and scope of said

agency and/or employment by the others, each and all of them acting in concert one

with the other and all together.

## IV.   FACTS COMMON TO ALL CAUSES OF ACTION

### A.   Mortgage Servicing

16.    A mortgage servicer stands in for the beneficial owner of a mortgage

loan in virtually all dealings with homeowners.  It is the servicer to whom the

homeowners mail their monthly payments, the servicer who provides billing and tax

statements for homeowners, and the servicer to whom a homeowner in distress must

address a request for a loan modification and/or postponement of a foreclosure sale.

#### 1.   Servicers Have Strong Incentives to Pursue Foreclosures

17.    Servicers' main source of income is a monthly servicing fee based on a

percentage of the outstanding principal balance of a loan.  However, servicers have a

strong incentive to foreclose on delinquent loans, as they can often make more money

by foreclosing on a home than by modifying a loan on that home.  The potential

losses of income from the monthly servicing fee are often dwarfed by the fees

generated for the servicer by the foreclosure process.

18.    Late fees and other "default management" fees, such as property

inspections, are a large source of income for servicers, as they retain these fees when

they are paid by delinquent homeowners.  The profitability of these fees can be

significant, and late fees alone constitute a significant portion of many servicers' total

income and profit.  Moreover, even if homeowners do not pay these fees, servicers

are able to collect them from the proceeds of foreclosure sales before the owners of

the mortgage loan receive any recovery.  This guaranteed recovery of fees provides a

strong incentive for servicers to foreclose on properties.

19.    Because fees for other activities like force-placed insurance, property

inspections, appraisals, title searches, and legal services to affiliated entities are also

recovered out of foreclosure proceeds, many servicers also in-source these activities, which is yet another reason for servicers to push foreclosures as opposed to modifications.

20.     Servicers incur significant expenses when a loan is in default:  advances of principal and interest to the owners of the loans, advances of property taxes and home insurance, and advance payments to third parties for default services such as property inspections, title searches, attorney fees, property maintenance fees, and foreclosure fees.  The financing cost of advances on delinquent loans is the largest expense of many servicers.  Reducing the cost of this expense is a key component of making servicing profitable.  Once a foreclosure is complete, the requirement to continue making advances stops and servicers are entitled to receive their advances back.

### 2.     Servicers Profit from Illegal Dual Tracking and Foreclosure

21.     Dual tracking occurs when servicers process both a foreclosure and a loan modification application for the same borrower at the same time.  Short-term repayment plans, such as trial modifications, are very attractive to servicers, as they require little to no underwriting, they do not require the servicer to recognize any long-term loss and, because they can be processed quickly, they address the servicers' largest expense:  financing principal and interest advances to the owners of defaulted loans and the advance payments for default services.  However, the financial incentives of foreclosure discussed above encourage servicers to proceed along a dual track, as their primary goal is foreclosure, not permanent modification.

22.     The owners of the loans expect subprime servicers, such as Defendant, to strictly adhere to explicit timelines, offer and accept workouts from only a predefined and standardized set of options, and not delay foreclosure while loss mitigation is underway.  The speed at which loans are moved from default through foreclosure is a key driver in the servicer rating process, encouraging servicers to compete for the fastest time to foreclosure.

23.     Servicers process foreclosures and loan modifications through different departments.  Communication between the two departments is imperfect.  Homeowners who are assured that they will be receiving a loan modification by one department nonetheless find themselves facing a foreclosure.  This occurs, in part, because loan modifications often require more deviations from the norm, such that they often take more time to work out than foreclosures do.  Servicers rely heavily on the mechanized production of form documents in processing both foreclosures and loan modifications.  Any variation from the cookie-cutter norm imposed by the form documents causes delay.  But the dual-track system pushes the foreclosure forward regardless of any delay in the modification process, with the result that foreclosures frequently occur while homeowners are negotiating a loan modification, and sometimes even after they have been approved for a loan modification.

24.     Servicers generally do not have any ownership interest in the loans they service and the financial incentives described above for servicing loans are reasons why servicers favor foreclosures over permanent modifications and why servicers engage in illegal dual tracking.

25.     Because the dual-tracking system prevents homeowners from being evaluated for appropriate loan modifications before foreclosure, it has resulted in many unnecessary foreclosures.

### 3.     The Illegal Collection of Late Fees from Struggling Homeowners Who Are Trying to Modify Their Loans

26.     Although not permitted under the HBOR, there is little downside for servicers to improperly charge late fees to financially distressed homeowners who are trying to have their loans modified, as  successfully challenging an illegally imposed late fee will not cure a mortgage default, much less make the mortgage affordable going forward.  Unless the homeowner has equity in the property, once that homeowner is losing the property, there is little point in haggling over the amount owed to the lender, especially in states like California, where deficiency judgments

FIRST AMENDED CLASS ACTION COMPLAINT
2:14-cv-00278-DDP (SHx)

are not permitted.  Even small illegal late charges, which are not likely to draw much attention, can be quite profitable for servicers if they are imposed in substantial volume.

27.     In a self-perpetuating cycle, the imposition of improper late fees on a struggling borrower makes a foreclosure more likely by increasing the total amount owed to the lender, and thus, increasing the monthly payment amounts in a potential modification.

**B.      The HBOR Outlaws Dual Tracking and Protects Distressed Homeowners from the Imposition of Late Fees While They Are Attempting to Have Their Mortgages Modified or Making Timely Modification Payments**

28.     The HBOR, which became law on January 1, 2013, marked the third step in California Attorney General Kamala Harris' response to the state's foreclosure and mortgage crisis.  The first step was to create the Mortgage Fraud Strike Force, which has been investigating and prosecuting misconduct at all stages of the mortgage process.  The second step was to extract a commitment from the nation's five largest banks of an estimated $18 billion for California borrowers under the National Mortgage Settlement.  This joint federal-state settlement contained thoughtful foreclosure and mortgage servicing reforms.  However, these reforms are only applicable for three years, and only to loans serviced by the five settling banks: Ally/GMAC, Bank of America, Citi, JPMorgan Chase and Wells Fargo.  Thus, the California Legislature intended the HBOR to extend the reforms addressed in the National Mortgage Settlement to almost all mortgage lenders and servicers and to bring fairness, accountability, and transparency to the mortgage servicing and foreclosure processes in California.

29.     According to California's Department of Justice and the Office of the Attorney General, the purpose of the HBOR is to ensure that as part of California's nonjudicial foreclosure process, borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options, if any, offered by or through

FIRST AMENDED CLASS ACTION COMPLAINT
2:14-cv-00278-DDP (SHx)

the borrowers' mortgage servicer, such as loan modifications or other alternatives to foreclosure.

30.     One of the most important aspects of the HBOR is that it outlaws dual-tracking.  Specifically, California Civil Code §§ 2923.6 and 2924.11 prohibit initiating or continuing the foreclosure process when a borrower's request for loss mitigation is under consideration, or a foreclosure prevention option has been approved in writing and the homeowner is complying with the terms of that option.

31.     Another important provision of the HBOR prohibits the collection of any late fees when a loan modification application is pending or while the borrower is making timely modification payments. California Civil Code § 2924.11(f).

**C.     Defendant's Business Practices**

32.     Defendant specializes in the servicing of subprime and seriously delinquent loans and serviced some or all of the home mortgage loans at issue.

33.     Defendant has two separate departments that handle Loss Mitigations and Foreclosures.  The Loss Mitigation department is supposed to provide loan resolution and workout strategy for non-performing loans.  The Foreclosure department is supposed to facilitate completion of the foreclosure process, ensure timeline adherence, eliminate redundancies, and minimize losses during the foreclosure process.  These departments rarely communicate effectively, if at all, with each other.

34.     Defendant also maintains a business practice of illegally charging and collecting late fees on delinquent loans that are being considered for a resolution or the loan already has an active loss mitigation resolution pending.  Even if a defaulted or delinquent loan is being considered for a resolution by Defendant or the loan already has an active loss mitigation resolution pending, Defendant's policy is to continue collecting these illegal late fees.

35.     Defendant also engages in a routine business practice of placing delinquent homeowners in short-term trial plan workout agreements and then putting

any trial plan payments made by the homeowner into a "suspense" account rather than crediting them to the homeowner's loan.  This practice allows Defendant to continue to treat these homeowners as failing to make their mortgage payments each month, and thus, Defendant continues charging and collecting these illegal late fees.

36.     Defendant's illegal practice of collecting late fees from homeowners is a win-win proposition because these late fees are added to the borrower's unpaid principal balance, thus increasing Defendant's monthly servicing fee, and/or Defendant can recoup these late fees after a foreclosure sale.

## V.     PLAINTIFFS' EXPERIENCE WITH DEFENDANT

### A.     The Stokes

37.     On July 10, 2013, the Stokes submitted a complete home loan modification application to Defendant.  The Stokes' home loan modification application included:  Request For Assistance and Affidavit Form, Dodd-Frank Certification, Form 4506-T, 2010 Tax Returns (which at that time was the Stokes most recent signed and filed tax returns as required in Defendant's home loan modification application), 2009 Tax Returns, Homeowners Policy Coverages and Limits Declarations Page, Income information including paystubs, their Property Tax Bill, and Bank Statements.

38.     On July 18, 2013, even though Defendant had not provided the Stokes' with a written determination on their loan modification application, Defendant recorded a Notice of Default on the Stokes' home. *See* Exhibit A.

39.     On July 31, 2013, Michael Harman, Defendant's Homeowner Support Specialist assigned to the Stokes' application, requested additional documentation from the Stokes including their 2012 tax returns.  In August of 2013, the Stokes furnished all of these documents to Defendant except for the 2012 tax returns which had not yet been filed.  The Stokes advised Defendant that they had obtained an extension on their 2012 tax returns but had, nonetheless, provided Defendant with all

///

of the income information that would be included in their shortly to be filed 2012 tax returns.

40.    On October 15, 2013, Defendant advised the Stokes that their request for mortgage assistance through the Freddie Mac Traditional Modification program had been denied, and Defendant gave the Stokes thirty (30) days to contact Defendant and request an appeal of Defendant's denial.

41.    On October 19, 2013, even though Defendant had admitted that the Stokes had a thirty day period to appeal the denial, Defendant recorded a Notice of Trustee Sale on the Stokes' home.  The Trustee's Sale was scheduled to take place on November 18, 2013. *See* Exhibit B.

42.    On October 29, 2013, the Stokes contacted Defendant and requested to be re-reviewed for a home loan modification.

43.    On November 4, 2013, Michael Harman emailed the Stokes that Defendant will continue the review process if they provide additional documentation including their 2012 tax returns.

44.    In November of 2013, the Stokes provided Defendant with the following additional documents:  4506T Form, Homeowners' Declaration Page, Paystubs, Bank Statements, Hardship Letter, Household Expenses Form, Profit and Loss Statement, Mr. Stokes' Employee Salary Report, and their 2012 tax returns which, by this time, had now been "signed and filed" as originally requested by Defendant.

45.    Thereafter, Defendant postponed the November 18, 2013 Trustee Sale on the Stokes home, and reset the date of the Trustee Sale to December 16, 2013.

46.    On December 12, 2013, Defendant advised the Stokes that their file has been forwarded to a Homeowner Support Specialist for review with an expected 30 day timeframe for Defendant to complete the review.

47.    On December 13, 2013, Defendant called the Stokes and told them that the underwriter had denied their home loan modification application and suggested that the Stokes pursue a short sale.

10

48.     Three days later, on December 16, 2013, Defendant sold the Stokes' home at a Trustee's Sale without ever providing the Stokes with the required detailed denial of home modification application letter.  The winning bid at the Trustee's sale was $585,000.  According to Defendant, the unpaid debt and costs associated with the Property at the time of the Trustee's Sale was $308,177.62.  On information and belief, this $308,177.62 amount includes illegal late fees assessed during the Liability Period, from July 10, 2013 through the date of the sale on December 16, 2013.

49.     On or about December 17, 2013, the Stokes received a Three-Day Notice to Quit, which was posted on their property.

50.     On December 17, 2013, Defendant sent a letter to the Stokes which stated that their file had been forwarded to a Homeowner Support Specialist for review.

51.     On December 18, 2013, Defendant sent a message to Marian Stokes stating that that the Stokes' request for a home loan modification was pending and under review.

52.     On December 18, 2013, Defendant advised the Stokes that their request for mortgage assistance through the Freddie Mac Traditional Modification program was denied.

53.     On January 10, 2014, Defendant advised the Stokes that their home loan modification application through the Home Affordable Modification Program ("HAMP") was denied and gave the Stokes 30 days to appeal the denial and to request alternative loss mitigation options.

54.     On January 16, 2014, the Stokes were mailed a notice that an Unlawful Detainer Complaint had been filed against them.

55.     The Stokes immediately retained counsel, not any of the attorneys of record in this class action case, to represent them in the Unlawful Detainer action. The parties in the Unlawful Detainer action negotiated a settlement; specifically, the Unlawful Detainer action plaintiffs would delay the Stokes' eviction from the

Property until May 31, 2014 in exchange for the Stokes' monthly rental payments. On April 15, 2014 the Stokes began renting a home nearby.

## B.   Ms. Brummel

56.   On August 8, 2013, Defendant filed a Notice of Default on Ms. Brummel's home.

57.   On October 1, 2013, Ms. Brummel submitted a complete home loan modification application to Defendant.  Ms. Brummel's home loan modification application included:  Request For Modification and Affidavit Form, Dodd-Frank Certification, Form 4506-T, 2011 Tax Returns (which at that time was Ms. Brummel's most recent signed and filed tax returns as required in Defendant's home loan modification application), Homeowners Policy Coverages and Limits Declarations Page, Income information including paystubs, Bank Statements, Homeowners' Association Statement, Utility Bill, and an additional hardship letter.

58.   On November 6, 2013, Defendant advised Ms. Brummel that her loan modification application had been submitted to Defendant's underwriting department, that an underwriter had not been assigned yet to her application, and that no additional documents were needed.

59.   On November 12, 2013, Defendant again advised Ms. Brummel that her loan modification application was with the underwriting department and that an underwriter had not yet been assigned to her application.

60.   On November 18, 2013, even though Defendant had not provided Ms. Brummel with a written determination on her loan modification application Defendant recorded a Notice of Trustee's Sale on Ms. Brummel's home.  The Trustee's Sale was scheduled to take place on December 17, 2013. *See* Exhibit C.

61.   On November 21, 2013, Defendant emailed Ms. Brummel informing her that she had been approved for a loan modification. *See* Exhibit D.

62.   On November 22, 2013, Defendant advised  Ms. Brummel that she had been approved for a Federal Housing Administration ("FHA") Home Affordable

Modification Trial Period Plan ("TPP").

63.     On December 5, 2013, Ms. Brummel received the FHA Home Affordable Modification TPP agreement; however, this agreement indicated a co-borrower in error.  On January 3, 3013, Ms. Brummel received another FHA Home Affordable Modification TPP agreement revised to show no co-borrower.  This TPP agreement required Ms. Brummel to make three trial period payments of $1,919.67 and then Defendant would convert the TPP into a permanent loan modification.

64.     On December 27, 2013, Ms. Brummel called Defendant and made her first month's trial plan payment in the amount of $1,919.67 by electronic payment.

65.     On January 8, 2014, Ms. Brummel signed and dated two original copies of the TPP Agreement and sent these copies to Defendant as requested by Defendant.

66.     On January 30, 2014, Ms. Brummel called Defendant and made her second month's trial plan payment in the amount of $1,919.67 by electronic payment.

67.     On March 3, 2014, Ms. Brummel called Defendant and made her third month's trial plan payment in the amount of $1,919.67 by electronic payment.

68.     On March 31, 2014, Gilbert Ponce de Leon, Defendant's Homeowner Support Specialist, stated that a Trustee's Sale for the property was scheduled to take place on April 8, 2014 and that there were no guarantees that the sale would be postponed even though Ms. Brummel had complied with the terms of the written TPP loan modification.

69.     On or about April 2, 2014, Ms. Brummel made an additional fourth month trial plan payment in the amount of $1,919.67 by electronic payment.

70.     On April 3, 2014, Defendant postponed the April 8, 2014 Trustee Sale on Ms. Brummel's home, and reset the date of the Trustee Sale to May 5, 2014.

71.     To date, Defendant has failed to provide Ms. Brummel with the promised permanent loan modification in violation of the terms of the TPP agreement.  Defendant has advised Ms. Brummel to continue making TPP payments.

///

## VI.   ALLEGATIONS

72.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to *Federal Rule of Civil Procedure* 23(a) and (b)(1), (b)(2), and/or (b)(3).  The Classes which Plaintiffs seek to represent are as follows:

1)  The "Dual-Tracking Class," which is comprised of all California homeowners who submitted a complete loan modification application to CITIMORTGAGE, INC. and who, at any time on or after January 1, 2013, received a Notice of Default, Notice of Trustee Sale, or Trustee's Deed Upon Sale, while their loan modification applications were pending.  The Stokes and Brummel are seeking to be appointed as representatives of this Class.

2)  The "Late Fee Class," which is comprised of all California homeowners who, at any time on or after January 1, 2013, paid CITIMORTGAGE, INC. late fees for periods during which a complete first lien loan modification was under consideration or a denial of the first lien loan modification was being appealed, while the homeowner was making timely modification payments, or while another foreclosure prevention alternative was being evaluated or exercised.  The Stokes are seeking to be appointed as representatives of this Class.

Excluded from the Classes are Defendant's employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

73.     Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate Sub-Classes in response to facts learned through discovery or legal arguments advanced by Defendant or otherwise.

74.     <u>Numerosity</u>:  The members of each of the Classes are so numerous that joinder of all members would be unfeasible and not practicable.  The membership of each of the Classes is unknown to Plaintiffs at this time; however, based upon the substantial number of loans in California serviced by Defendant, upon and information and belief, the Classes are each estimated to be in excess of a thousand

individuals residing in California, and the identity of such membership is readily ascertainable via inspection of Defendant's business and loan servicing records. Class members may be notified of the pendency of this action by electronic mail, the Internet, other mail, or published notice.

75.    Commonality:  There are common questions of law and fact as to each of the Classes which predominate over questions affecting only individual members, including, without limitation to:

a.  Whether Defendant violated California's HBOR;

b.  Whether Defendant improperly recorded Notices of Default, Notices of Trustee Sale, and/or Trustee's Deed Upon Sale;

c.  Whether Defendant illegally collected homeowners late fees;

d.  Whether Defendant's violations of HBOR was intentional, reckless and/or willful.;

e.  Whether Defendant violated California's Unfair Competition Law;

f.  Whether Defendant engaged in practices that warrant equitable, injunctive, and monetary relief; and

g.  The effect upon and the extent of injuries suffered by Plaintiffs and other Class members and the appropriate amount of reimbursement, restitution, damages, or other compensation.

h.  Whether Defendant's affirmative defenses, if any, raise common issues of fact or law as to Plaintiffs and Class Members as a whole.

76.    Typicality:  Plaintiffs' claims are typical of the claims of the members of each of the Classes that they seek to represent.  Plaintiffs and all members of the Classes sustained injuries and damages arising out of Defendant's common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of law as alleged herein.

///

77.    <u>Adequacy of Representation</u>:  Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs are adequate representatives of the Classes as they have no interests which are adverse to the interests of the absent Class members.  Plaintiffs have retained counsels who have substantial experience and success in the prosecution of complex class action and consumer protection litigation.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

78.    A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Classes is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.  The cost of the court system of adjudication of such individualized litigation would be substantial.  Individualized litigation would also present the potential for inconsistent or contradictory judgments.

79.    In the alternative, the Classes should be certified because:

    a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant;

    b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them, which would, as a practical matter, be dispositive of the interests of the

other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

   c. Defendant has acted or refused to act on grounds generally applicable to the Classes, and/or the General Public, thereby making final injunctive relief and/or declaratory relief with respect to the Classes as a whole appropriate.

80. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of California's HBOR – Ban on Dual Tracking**
**(Against All Defendants)**

81. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

82. The HBOR requires that if a borrower submits a complete application for a first lien loan modification offered by, or through, the borrower's mortgage servicer, a mortgage servicer, trustee, mortgagee, beneficiary, or authorized agent shall not record a notice of default, notice of sale, or conduct a trustee's sale while the complete first lien loan modification application is pending. Cal. Civ. Code § 2923.6(c). Defendant violated Cal. Civ. Code § 2923.6(c) when Defendant recorded a notice of default and/or notice of sale and/or conducted a trustee's sale on Plaintiffs' and Class Members' properties while their complete loan modification applications were still pending.

83. Defendant's violations of Cal. Civ. Code § 2923.6(c) as alleged herein were intentional, reckless and/or willful since Defendant purposefully maintain an automated dual-track system business practice where its Loss Mitigation Department processes loan modification applications while at the same time its Default Servicing

Unit continues to follow the path of least resistance and surest returns – foreclosures.

84.     As a direct and proximate result of the aforementioned violations, Plaintiffs and the Dual-Tracking Class members have been harmed in the following ways:

- Loss of homes;
- Loss of home equity;
- Relocation costs;
- Loss of TPP Agreement payments and other foreclosure fee payments;
- Loss of the opportunity to pursue other strategies to avoid foreclosure;
- Damage to financial reputations; and
- The financial, credit, and emotional toll of defending against foreclosures.

85.     WHEREFORE, as a result of Defendant's aforementioned violation of the HBOR's ban on dual tracking, Plaintiffs and the Dual-Tracking Class members seek:

a.   Damages, including statutory damages, pursuant to Cal. Civil Code §§2924.11(b) and 2924.12(b);

b.   Injunctive relief pursuant to Cal. Civil Code §§ 2924.11(b) and 2924.12(a) forbidding Defendant from continuing to engage in the unlawful acts as alleged herein; and

c.   An award of reasonable attorney's fees and costs to the prevailing Plaintiffs pursuant to Cal. Civil Code §§ 2924.12(i).

///
///
///
///
///
///

1

## SECOND CLAIM FOR RELIEF

2

### Violation of HBOR – Illegal Collection of Late Fees

3

### (Against All Defendants)

4    86.    Plaintiffs incorporate all preceding paragraphs as though fully set forth

5    herein.

6    87.    The HBOR prohibits mortgage servicers from collecting any late fees for

7    periods during which a complete first lien loan modification application is under

8    consideration or a denial is being appealed, the borrower is making timely

9    modification payments, or a foreclosure prevention alternative is being evaluated or

10   exercised. Cal. Civ. Code § 2924.11(f).  Defendant violated Cal. Civ. Code §

11   2924.11(f) when it continued to routinely collect late fees from the Stokes and other

12   similarly situated homeowners even though the Stokes and the other Late Fee Class

13   members had complete loan modification applications pending or they were timely

14   making their modified monthly mortgage payments pursuant to Defendant's TPP

15   Agreements.

16   88.    At all times relevant, Defendant maintained an illegal practice of

17   continuing to assess late fees on homeowners being reviewed for a loan modification.

18   Defendant adds late fees to the borrower's unpaid principal balance thus increasing

19   Defendant's monthly servicing fee, and/or Defendant recoups these late fees after the

20   foreclosure sale.  In particular, on December 16, 2013, Defendant sold the Stokes'

21   home at a Trustee's Sale for $585,000.  According to Defendant, the unpaid debt and

22   costs associated with the Property at the time of the Trustee's Sale was $308,177.62.

23   On information and belief, this $308,177.62 amount includes late fees assessed

24   during the period from July 10, 2013 through the date of the sale on December 16,

25   2013 while the Stokes were being reviewed for a loan modification.  Therefore, these

26   late fees were illegally collected by Defendant in violation of the HBOR.

27   89.    Defendant's violations of Cal. Civ. Code § 2924.11(f) as alleged herein

28   were intentional, reckless and/or willful.

90.     As a direct and proximate result of the aforementioned violations, the Stokes and Late Fee Class members have been harmed by the illegal late fees Defendant collected during the liability period.

91.     WHEREFORE, as a result of Defendant's aforementioned violations of the HBOR, the Stokes and Late Fee Class members seek:

a.  Damages, including statutory damages pursuant to Cal. Civil Code § 2924.12(b);

b.  Injunctive relief pursuant to Cal. Civil Code § 2924.12(a) forbidding Defendant from continuing to engage in the unlawful acts as alleged herein; and

c.  An award of reasonable attorney's fees and costs to the prevailing Plaintiffs pursuant to Cal. Civil Code §§ 2924.12(i).

## THIRD CLAIM FOR RELIEF

### Violations of California's Unfair Competition Law

### (Against All Defendants)

92.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

93.     Plaintiffs bring this cause of action on behalf of themselves, on behalf of members of the Classes, and in their capacity as private attorneys general against Defendant for its unlawful, unfair, fraudulent and/or deceptive business acts and/or practices pursuant to California Business & Professions Code § 17200, *et seq.* (the "UCL") which prohibits all unlawful, unfair, and/or fraudulent business acts and/or practices.

94.     Plaintiffs and members of the Classes assert these claims as they are representatives of aggrieved groups and as private attorneys general on behalf of the general public and other persons who have expended funds that Defendant should be required to pay or reimburse under the restitutionary remedy provided by the UCL.

///

95.     Plaintiffs and members of the Dual-Tracking Class are or were California homeowners who submitted a complete loan modification application to Defendant and who received, on or after January 1, 2013, a Notice of Default, Notice of Trustee Sale, or Trustee's Deed Upon Sale, while their complete loan modification application was still pending, which is a violation of the HBOR.

96.     The Stokes and members of the Late Fee Class are or were California homeowners who, at any time on or after January 1, 2013, Defendant assessed and collected late fees for periods during which a complete first lien loan modification was under consideration or a denial of the first lien loan modification was being appealed, while the homeowner was making timely modification payments, or while another foreclosure prevention alternative was being evaluated or exercised.

97.     The Stokes and members of the Late Fee Class are or were California homeowners who, at any time on or after January 1, 2013, paid Defendant late fees for periods during which a complete first lien loan modification was under consideration or a denial of the first lien loan modification was being appealed, while the homeowner was making timely modification payments, or while another foreclosure prevention alternative was being evaluated or exercised.

98.     By engaging in the above-described acts and practices, Defendant has committed one or more acts of unfair competition within the meaning of the UCL.

99.     As a result of the persistent and pervasive violations of the HBOR as alleged herein, Plaintiffs have suffered injury and lost money and property, including but not limited to, the loss of their homes, loss of TPP Agreement payments, loss of money through Defendant's unfair and unlawful business practices resulting in the collection of illegal late fees, foreclosure fees, loss of home equity, loss of payments of increased interest, higher principal balances, additional income tax liabilities, costs and expenses incurred to prevent or fight against foreclosures and evictions, and relocation costs.

///

100.  <u>Unlawful</u>:  The unlawful acts and practices of Defendant alleged above constitute unlawful business acts and/or practices within the meaning of the UCL. Defendant's unlawful business acts and/or practices as alleged herein have violated numerous laws including state statutory and/or common law – and said predicate acts are therefore per se violations of the UCL.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:

  a.  Violations of Cal. Civ. Code § 2923.6(c) (Dual-Tracking Ban while loan modification applications are pending),

  b.  Violations of Cal. Civ. Code § 2924.11(f) (Prohibition against collection of late fees while loan modification applications are pending or when homeowners are making timely trial plan payments)

101.  <u>Unfair</u>:  Defendant's persistent and pervasive violations of the HBOR as alleged herein constitute willful, intentional, reckless, negligent and other tortious conduct and gave Defendant an unfair competitive advantage over their competitors who did not engage in such practices.  Said misconduct, as alleged herein, also violated established law and/or public polices which were enacted on January 1, 2013 to bring fairness, accountability, and transparency to the state's mortgage and foreclosure process and to ensure that as part of California's non-judicial foreclosure process, borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options, if any, offered by or through the borrowers' mortgage servicer, such as loan modifications or other alternatives to foreclosure. Dual-tracking, charging and collecting illegal late fees from homeowners with a completed loan modification application pending or homeowners who are in compliance with a TPP Agreement were and are directly contrary to established legislative goals and policies to promote fairness, accountability, and transparency to the state's mortgage and foreclosure process and thus, Defendant's acts and/or practices alleged herein were and are unfair within the meaning of the UCL.

///

FIRST AMENDED CLASS ACTION COMPLAINT
2:14-cv-00278-DDP (SHx)

102.   The harm to Plaintiffs, members of the Classes, and members of the general public outweighs the utility, if any, of Defendant's acts and/or practices as alleged herein.   Thus, Defendant's deceptive, automated dual tracking, and sharp business acts and/or practices, as alleged herein, were unfair within the meaning of the UCL.

103.   As alleged herein, Defendant's business acts and practices offend established public policies, including public policies against willful or reckless ignorance of state statutes, breaching contractual obligations, and frustrating economic recovery and relief for distressed California homeowners.  These practices are and were immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and thus unfair within the meaning of the UCL.

104.   At all times relevant, Defendant's misconduct as alleged herein caused: 1) substantial injury to Plaintiffs, members of the Classes, and the public; 2) had no countervailing benefit to consumers or to competition that could possibly outweigh these substantial injuries; and 3) caused injury that could not have been avoided or even discovered by ordinary consumers because it resulted from Defendant's illegal dual-tracking and illegal collection of late fees which Defendant could have easily prevented.  Thus, Defendant's acts and/or practices as alleged herein were unfair within the meaning of the UCL.

105.   As a direct and proximate result of the aforementioned acts and/or practices, Defendant received from Plaintiffs and the members of the Classes monies and continue to hold these monies including but not limited to TPP Agreement payments, increased monthly servicing fees due to capitalizing arrears to unpaid principal balances, delinquent late fees, other foreclosure fees like force-placed insurance, property inspections, property maintenance fees, appraisals, title searches, and legal services which were all inflated fees because these activities were in-sourced to other affiliated entities, and profits realized from the sale of Defendant's

///

mortgage serving rights to other entities at a higher value due to Defendant's manipulation of the quality of the loans in its servicing portfolio.

106.   The unlawful and unfair business acts and practices of Defendant, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by as alleged herein.  Plaintiffs, members of the Classes, and other members of the general public have no other remedy of law that will prevent Defendant's misconduct, as alleged herein, from occurring and/or reoccurring in the future.

107.   As a direct and proximate result of Defendant's unlawful and unfair fraudulent conduct alleged herein, Plaintiffs and the members of the Classes have collectively lost millions of dollars through the loss of their homes, relocation costs, loss of equity in their homes, loss of their TPP Agreement payments, loss of payments of illegal late fees, loss of payments of inflated foreclosure fees, and by having to make mortgage payments on an inflated unpaid principal balance. Plaintiffs and the members of the Classes are direct victims of the Defendant's unlawful and unfair conduct, as alleged herein, and the named Plaintiffs have suffered injury in fact, and have lost money or property as a result of Defendant's unfair competition.

108.   WHEREFORE, Plaintiffs and the members of the Classes are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendant because of its unlawful and/or unfair acts and practices, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining Defendant from engaging in the wrongful activity alleged herein.

///

///

///

///

///

## **PRAYER FOR RELIEF**

1

2      WHEREFORE, Plaintiffs and similarly situated members of the Classes pray

3 for judgment against Defendant as follows:

4      A.    An order certifying this case as a class action, appointing the Stokes, Ms.

5            Brummel, and their counsel to represent the Dual-Tracking Class, and

6            appointing the Stokes and their counsel to represent the Late Fee Class;

7      B.    For damages, including statutory damages pursuant to California Civil

8            Code § 2924.12(b);

9      C.    For equitable relief, including restitution, as permitted by law;

10     D.    For injunctive relief forbidding Defendant from engaging in the unlawful

11           and unfair acts as alleged herein;

12     E.    For pre- and post-judgment interest, and;

13     F.    For such other and further relief as this Court finds necessary and proper.

14

15 DATED: April 22, 2014              **HOWARD LAW PC**

16

17

18                                    VINCENT D. HOWARD
                                      vhoward@howardlawpc.com
19                                    GREGORY H. D. ALUMIT
                                      galumit@howardlawpc.com
                                      675 Anton Boulevard, First Floor
20                                    Costa Mesa, CA 92626
                                      Tel.: (800) 872-5925
21                                    Fax: (888) 533-7310

22                                    **ARBOGAST LAW**
                                      A Professional Corporation
23                                    DAVID M. ARBOGAST
                                      david@arbogastlawpc.com
24                                    11400 W. Olympic Blvd., 2nd Floor
                                      Los Angeles, CA 90064
25                                    Tel.: (310) 477-7200

26                                    *Attorneys for Plaintiffs and Proposed Class*

27

28

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

DATED: April 22, 2014                    **HOWARD LAW PC**

VINCENT D. HOWARD
vhoward@howardlawpc.com
GREGORY H. D. ALUMIT
galumit@howardlawpc.com
675 Anton Boulevard, First Floor
Costa Mesa, CA 92626
Tel.: (800) 872-5925
Fax: (888) 533-7310

**ARBOGAST LAW**
A Professional Corporation
DAVID M. ARBOGAST
david@arbogastlawpc.com
11400 W. Olympic Blvd., 2nd Floor
Los Angeles, CA 90064
Tel.: (310) 477-7200

*Attorneys for Plaintiffs and Proposed Class*

FIRST AMENDED CLASS ACTION COMPLAINT
2:14-cv-00278-DDP (SHx)